May it please the Court, Joseph Terry with Williams & Connolly for Appellants. I'd like to reserve five minutes for rebuttal. This case arises from the tortious conduct of GMAC, one of the nation's largest providers of automobile financing. This conduct drove my client, Yarrington Ford, out of business. It also resulted in significant damage to the other appellants. The appellants sought relief in the District Court of Nevada. Now, you say the other appellants. Are the other appellants also your clients? They are. So the Gileses, Yarrington, and Giles Chevrolet are all your clients? That's correct, Your Honor. I represent all the appellants, and they are two car dealerships and the two principal owners of those car dealerships, Mr. and Mrs. Giles. Now, I don't know that the question is immediately in front of us, and it's a little opaque to me as I read the papers. I gather that the district judge found that there was a conflict of interest that prevented a single counsel from representing all of these parties on the contract claims. That's right, Your Honor. And that issue is not on appeal. The appellants voluntarily ---- But you seem to be representing at least Giles Chevrolet on contract claims. Well, that's right, Your Honor, and ---- So what am I supposed to make of that? With respect to the contract claims, we represent them as to the issue of whether or not the prior decision was res judicata. I understand that. Solely for that. And our claim is solely that the contract claims survive in this Court. And there's no conflict of interest in asserting that? I don't believe there is. I mean, the legal issue as to whether or not that issue is res judicata as to the parties is the same issue for each of the parties. They have a unity of interests in this case. And I have not seen them raise before us a conflict question as to your representation on that. That's right. They have not challenged our conflict issue in this case. The district court primarily dismissed this case on two grounds. First, the district court held that as a matter of law, because the relationship between the parties arose from a contract, the appellants were without remedy for any tort claim arising out of the contract, whether sounding in negligence or intent or whether constituting a breach of fiduciary duties. This ruling fundamentally misapplies the economic loss doctrine. A contract is simply not carte blanche to commit intentional torts or to ignore fiduciary duties. And there's simply no Nevada law that supports that whole. Second, the district court found that there was no fiduciary or special relationship between the parties. This ruling ignored established Nevada precedent and also the facts in this case. This is a question that should have been submitted to the jury. And third, the district court held that Yarrington Ford's voluntary dismissal of its contract claims against GMAC arising out of its contract with GMAC barred Giles Chevrolet, a separate dealership, from bringing separate claims arising from a separate contract. The Nevada Supreme Court has already spoken as to the proper boundary of the economic loss doctrine. You know, as I read the Nevada cases and I, well, as I read the Nevada cases that I have so far read, I think the question presented here is not directly answered by the Nevada cases. We can draw certain inferences and conclusions. We can do the ordinary thing you do as a lawyer or as a judge. You try and figure out, okay, what's the structure and what's the answer here. But I don't see that we have a case in Nevada that's directly controlling. Should we certify? Did you ask below for certification? Should we, are you asking, would you wish now to ask for certification to the Nevada Supreme Court? Your Honor, prior counsel did not ask for certification. And I do not believe that certification here is necessary. If the Court believes the question is unclear, it can certify the question itself. It can direct us to certify the question. That's the Nevada Supreme Court. The Nevada rules of appellate practice permit that. We'd be happy to do it. I think the answer is clear because of what the Nevada Supreme Court has said. Twice the Nevada Supreme Court has discussed the boundary of the economic loss doctrine in the Callaway case and in the Stern case. And in both of those cases, the Court explained that the boundary was between negligence and intent. And here's the quote from the Callaway case, which I think is important. Although a cause of action for intentional tort is not precluded under the economic loss doctrine, appellants did not plead fact to support an intentional tort. So as you suggest, it was not a case where the Court was confronted with an intentional tort, but in its own language, it suggested that that is where the boundary exists. That's the same boundary that the Nevada Supreme Court drew 20 years earlier in the Stern case, again, an action for negligence. There, the Court explained that the primary purpose of the economic loss doctrine is to, quote, So we have the two instances where the Nevada Supreme Court has spoken. In both instances, it draws the line at the distinction between intent and negligence. There is not a single Nevada case that has applied the economic loss doctrine to intentional torts or breaches of fiduciary duty. Every case cited by appellees, every case cited by the district court, and all of the cases that we cite are cases for negligence. This isn't mere happenstance. This reflects the very purpose of the economic loss doctrine. Kennedy. So the district court, to some extent, relied on out-of-State law, right? It did. It largely relied on out-of-State law. And there are, I'll call them, non-Nevada cases that apply the doctrine to intentional torts. There are, Your Honor. But with respect to fiduciary duty claims, first of all, there is only a single case, a single case at the district court or appellee's site that has held that the doctrine applied to fiduciary claims, and that is the Greenberg case. It is a Utah Supreme Court case applying Wyoming law, making a prediction as to what another State would do. In short, it's a case that has no presidential value in Nevada, none in Wyoming, and none in Utah. On the other hand, there are a number of jurisdictions. Every other court, as far as we know, that has considered the issue has drawn the line at breach of fiduciary duty, holding the doctrine does not bar that claim. And I think in analyzing this question, we have not only the two explicit statements of the Nevada Supreme Court, but we also have the rationale for the doctrine set forth in Callaway. In Callaway, the Court provided some guidance as to what we look at when we decide to expand the doctrine. There, the Supreme Court said, you look at the policy behind the doctrine and the policy behind tort law and contract law. I think if we consider those three factors, it's quite clear the doctrine should not encompass breaches of fiduciary duty or intentional torts. With respect to breaches of fiduciary duty, the entire purpose of the body of fiduciary duty is to hold parties to a higher level of conduct than would otherwise exist in a contract. It's, in the words of Justice Cardozo, to hold people to a standard higher than, quote, the morals of the marketplace. So in this case, give me your best shot as to why there's a fiduciary relationship. Well, I think there are really five reasons. And again, this is a question that the Nevada Supreme Court is not silent on. In the McIntosh case, the Supreme Court held that the relationship between a lender and seller of property to the buyer and borrower of property could be a fiduciary relationship or a confidential relationship. And the reason was because the additional role of the seller as also being the lender in the transaction could be enough to create a jury question as to whether or not there is a fiduciary relationship. Courts from around the country have recognized that the relationship between a lender and a borrower will become fiduciary when there is substantial control or substantial disparity in bargaining power. And that is precisely what you have in this case. You have a situation where GMAC was providing financing for Yarrington Ford. Yarrington Ford was found to be out of trust with his vehicles. Eleven days later, it paid off the vehicles it had not yet paid GMAC for. During that time, GMAC used its leverage, along with fraudulent inducements, to persuade appellants to enter into a series of contracts, contracts which gave GMAC power it did not already have and contracts that GMAC induced them to enter into for its own benefit. You also have the representations of GMAC's agent. This case is unlike many others you'll see in a creditor-borrower relationship. Here, you have an agent of a creditor explaining to the Gileses that the relationship was, quote, like a marriage. But that statement's early, early on when they're first getting in. That statement was at the inception of the relationship between Giles and Bill Giles Motors with GMAC. I have to say that anybody who believes that it's like a marriage in the sense of intimacy has got rocks in his head, and I don't think Mr. Giles had rocks in his head. That's true. And I think that, in part, you have to look at all of the factors that were at play here. You have the existence of the wholesale financing agreement. And one thing that I'd like to clear up is the district court seemed to rely on the notion that the wholesale financing relationship between my clients and GMAC had some sort of waiver of fiduciary duty. That simply is not the case. Wasn't there an express statement in the agreement? That was not in the wholesale financing agreement. And there were one of the agreements. It was in a different set of agreements. The relationship Not a fiduciary relationship. That's right, with respect to the second part of the relationship. And the relationship, as I mentioned, has two parts. In the first part, the part we're here today about, the fiduciary part, GMAC provided financing to Yarrington Ford and Bill Giles Motors to purchase automobiles. That's the borrower-lender relationship. There is a second separate relationship which contained the language that you're discussing. It was a purchase agreement whereby GMAC had the right to buy from Yarrington Ford the consumer leases that Yarrington had with its consumers. From the face of the second agreement, it made plain, it was a buyer-seller relationship. That's it. No fiduciary duty created by that. We don't claim that there was. The second relationship was different. That was the financing relationship. And the acts that occurred here occurred under that financing relationship. The other thing that I would ask you to take a look at is how much control GMAC chose to exercise over Yarrington Ford. When GMAC found that Yarrington Ford was out of trust, it took action to advise Yarrington Ford how to run its business, and it, in fact, effectively managed and controlled Yarrington Ford's business. It had possession of all of the keys in Yarrington Ford's inventory, and its agents would leave early, wouldn't come in on Sunday, meaning that GMAC effectively controlled the hours of operation of the dealership. Were the GMAC employees or representatives at Yarrington Ford all day long during business hours? I understand that they were during a short period after they were found out of trust. It was during a 30-day period. They controlled the keys. They controlled the hours of operation. They controlled whether the cars would be sold. And how long did that degree of presence and control last? That element of presence and control lasted for 30 days. There were a number of other elements. Then what happens? I'm trying to figure out degree of actual control. So after 30 days, they say, listen, you can have the keys and do whatever you want? I believe that's correct, Your Honor. So then, so after that 30 days is up, what are the elements of control? The other elements involved GMAC's control over the operations of Yarrington Ford. GMAC dictated which employee, only a single employee, could handle the cash transactions. It dictated how Yarrington Ford. And they did that because? They did that because I believe the out-of-trust situation arose out of a situation where an employee may have been selling cars without reporting the sales. There was some suspicion of embezzlement by an employee. Exactly. And the person required by GMAC to do the cash was Mrs. Giles? Mrs. Giles. She was the only individual who worked there. GMAC required that the Gileses refinance their personal residences, inject $600,000 of capital into the dealership. They required that the Gileses put a $4.3 million loan on their property. Okay. That doesn't sound as though that's control of the business, however. That's control of the Giles. That's the second element. When you ask whether a confidential relationship exists, it's not just simply control, as the Court explained in the guarantee title case. The other element is the distinction in bargaining power to the two individuals. And I think what the Court said there is significant and bears on this case as well. It explained that examples of special relationships include those between insurer and insured, partners and partnerships, and franchises and franchisers. Each of these relationships shares a special element of reliance. In these situations, there is a need to protect the weak from the stronger. In addition, we have expanded the tort remedy to certain situations in which one party holds vastly superior bargaining power. And that was the case here. Even if a fiduciary duty does not exist, it was still enough to create a confidential relationship, the type of confidential relationship that gives rise to an action for constructive fraud. Constructive fraud is where a relationship implies a duty to speak that would not otherwise exist. It's a lower level of proof than fiduciary duty. And here, it's been met. Significantly, in the McIntosh case, the Nevada Supreme Court explained that this is a question for the jury. It is a question that involves analysis of all of the factors. Now, are there disputed questions of fact, that is to say, as to what actually happened that bear on the question of fiduciary duty? Or is it really a question of what do these undisputed facts do in terms of creation of the fiduciary duty? Well, the district court began its opinion by saying that nearly every issue in this fact is in dispute. And I believe the issues that you're discussing bearing on this issue that were in dispute involve the behavior of the GMAC agents when they're on the lot, involves the representations made by GMAC's agents when they persuaded the Gileses to enter into the agreements by which they placed a $4.3 million lien on the property, as well as when they agreed to inject further capital into the business. So there are a number of disputed facts on that area. For the purposes of withstanding summary judgment, the Gileses and the car dealerships need only have an inference in their favor that this creates a disputed issue of fact. And I think these five facts, when you take into account what the Nevada Supreme Court said in McIntosh about it being a jury question and that a lender-borrower relationship could be confidential, is sufficient. And one case that I think is very much on point is a Florida case, which is the Florida Capital Bank case. In that case, there is a representation almost identical to the one in this case. The representation was, you are part of a capital bank family. You help the bank, we help you. The court looked at that, the fact that the lender's role exceeded that of a lender in a usual transaction, and that the defendant knew that the borrower was financially weak and took advantage of this. Here, GMAC had the opportunity to simply exercise its contractual rights under the wholesale financing agreement and seize the cars, shutter the car dealership. It didn't want to do that because that wasn't in its financial interest. Instead you indicated you wanted to save some time. You've got four minutes left. You've not yet addressed the res judicata question, but rather than be sort of strict in terms of what's rebuttal and what's not, why don't we hear from the other side, and then we'll hear from you. And if you want to address at that time res judicata, feel free to do so. That would be great, Your Honor. Thank you. May it please the Court. Rick Hsu on behalf of GMAC. Your Honors, what I want to do is go through three issues primarily. One is waiver. Two is the district court's correct decision that the conduct complained upon was interwoven with the contract. And three is the fiduciary duty issues. Unless you want to go out of order, of course. Okay. So let's talk about waiver real quick. Issues one and two raised on appeal have been raised by the appellant saying that the Supreme the Court erred in predicting that Nevada would apply the economic loss doctrine to intentional torts. That's issue one. And two, that he erred in applying it to a financing relationship. Those issues were never appealed or were never even raised or argued down below. And what happened is that when we filed our motion for summary judgment on the economic loss doctrine, the opposition, followed by the plaintiffs, they went down count by count in counts four through ten. They said the plaintiffs agree that this claim is barred by the economic loss doctrine because the duty the defendant allegedly breached is imposed by the floor plan agreement. In essence, they are consenting of the applicability of the economic loss doctrine with respect to the dynamics of contract versus tort. And the district court picked up on this. They state, the district court states in its order granting summary judgment, ostensibly, plaintiffs do not dispute that tort claims that are interwoven with contract claims should be barred by the economic loss doctrine. Wait a minute. I read that stipulation. It's very clear that as to certain counts, they say economic loss doctrine bars. But as to others, very clearly, they say it does not. And as far as I can tell, the claims on which the appeals are brought are claims where that stipulation specifically said economic loss doctrine does not apply to bar the claim. Am I reading that stipulation incorrectly? No. Well, actually, what you're reading is an opposition to a motion for summary judgment where they make no argument, present no argument that the Nevada court would never apply the economic loss doctrine to a counsel tort. But you're not talking about argument. You're talking about explicit waiver. And as I read it, they say it was the counts. I think it's begins with count four and so on. That's correct. Economic loss bars. But then they say as to the others, it does not. And you're arguing waiver. You're not arguing argument. You're arguing waiver. What I'm arguing is that they failed to raise the arguments advanced today in issues one and two below. Failing to generally an appellate court will not review an issue not raised or objected to below. You know, if they didn't raise it, the district judge was pretty creative because the district judge spent an awful lot of published time discussing those very issues. Well, that is true because what they did is a phenomenal job of predicting how the Nevada court would address this issue here on the economic loss doctrine. That being said, it doesn't sound like you're convinced on the waiver issue, so I'll move to the second issue. I'm not speaking for my client. Okay. So we'll move to the whole purpose of the economic loss doctrine, as alluded earlier, is to divide contract and tort. And when you look at what are we talking about? We're talking about duties imposed by agreement versus duties imposed by society. And when you look at that, we're talking about risks. How are the parties in a position to contractually shift their risk to the other parties, or should society be required to take those risks in some way? And when we talk about the case here, you have the floor plan financing agreement. It's undisputed that that relationship had been in place when this occurred in terms of the out-of-trust sales by the dealer here. That triggers what you have here is a breach of the contract admitted to by Mr. Giles and the dealerships here. What you have here after that also, through contractual risks, you have a floor plan financing agreement, which states that the financing is discretionary. It may be changed, modified in the discretion of GMAC. If they don't feel secure, they may change the nature of the financing. And so when GMAC discovers that there's an out-of-state or out-of-trust sale, which is a very serious violation, they feel insecure and they have a right to ask for additional things to be, additional demands to be met. If they don't get those demands met, they have a right to pull the financing. Again, this is something we're in the middle of a transaction in terms of allocating risks. What you have here is Urington Ford in a position to analyze their risk. What's my risk here? Either I keep the continued financing of GMAC under these additionally imposed burdens, which is going to burden my company, or I look around and shop the marketplace for other lenders who will provide floor plan financing. That is all the nature of what we're talking about. That is why the Court correctly held that these transactions, everything complained about is interwoven with the contract. You can shift the risk contractually. But to be precise, the torts upon which Urington Ford is now relying and the torts as to which they are arguing there is no application of the economic loss doctrine are conversion and fraud, correct? Well, they're saying conversion, fraud, and breach of fiduciary duty. Right. But when you look deeper – I'm not talking without respect to fiduciary duty. Okay. Let's ignore that for the moment. Okay. You're talking conversion. That sounds like wrongful exercise of dominion over the chattel of another. I understand that definition. That sounds like an independent freestanding tort. And the other one is fraud. That's an independent freestanding tort. Why – I have trouble reading the Nevada cases to say that those two intentional torts are covered under the economic loss doctrine. What case do you have that tells me that those two intentional torts are covered? What I have, Your Honor, is footnote 3 in Callaway, which – where they say that any attempt to exempt any certain type of case from the doctrine's application is rejected. Hang on. Hang on just a second. Let's read footnote 3 together. I'll get back to that. Do you have footnote 3, he says? Footnote 3. Okay. Do you have footnote 3? It says, and I don't have the very beginning part of the sentence, mid-sentence, any attempt to exempt a certain type of case from the doctrine's application without analyzing the policy's rationales underlying the doctrine and without considering the very real distinctions between the policies governing recovery and contract and tort necessarily shifts the focus to a particular plaintiff or group or group of plaintiffs. And such an approach undermines the very purpose of the economic loss doctrine, which is to provide a boundary between contract law and tort. So when we talk about – That's all you got? Well, that's all I got at this point. We do have a number of district court decisions applying it. I mean, we have this case. Which is on appeal. Well, we have another case that talks about applying it to a breach of fiduciary duty, but potentially applying it. But what we have here, the best we can do is predict that the Supreme Court, Nevada Supreme Court, would never just carte blanche say, oh, conversion. You characterize it as conversion, or you characterize it as fraud, therefore it's out. You have to look at what is alleged in the complaint. And what is alleged? Does this all occur? But as I understand the core of the economic loss doctrine as applied in Nevada, it says if you've got a negligent tort that is also a breach of the contract, economic loss doctrine applies, I'm having trouble finding a Nevada case that says an intentional tort, or maybe I'll be more specific, the intentional torts of conversion and fraud come within the scope of the doctrine. Well, I'll tell you, the Nevada Supreme Court has not addressed that issue. But when you look at Callaway, and you look at the way they have done that. Your best evidence out of Callaway is this footnote? Well, let's also look at the some cases leading up to Callaway. You have the Stern case, and you also have, if you could bear with me, Bernard v. Rockwell Development Company. That's a case decided by the district court. And you have the Stern case. And in both of those cases, the Supreme Court really looked at separating the duties, determining whether or not a duty is independent of a contract or if it is imposed by a contract. And so when you look at the Bernard v. Rockwell Development, they said that the person, the defendant, there was a question because the defendant had fraudulently induced the plaintiff to unrecord a land sales document. That's essentially a fraud in the inducement type of claim. And it's exactly what the district court picked up on. Right. So that was not covered. That's not covered. But they would go through that exact analysis is what I'm getting at. In a sense, that's neither here nor there because that doesn't tell you on what side of the line that falls. But that doesn't quite tell you where the line is with respect to some other kind of fraud. I mean, I have to say it suggests a little bit that you're wrong, but it doesn't prove that you're wrong because it's a different kind of fraud. I totally agree. But what I tell you, what I'm suggesting is that they will look at the case on a case-by-case basis, just as stated in footnote 3, and they will look at the line drawn between contract and tort. And to the extent that there's a fraud that is in a fraud claim, basically a fraud in the performance claim, if it's interwoven with the contract, that's going to be barred by the economic loss doctrine. In the sense of the conversion claim, taking keys, the district court picked up on that. GMAC had a right to contractually and under the UCC to possession of the vehicles. So having the vehicles, essentially possession of the vehicles, they had a – they were basically exercising their rights. And under the common law notion of a conversion, that is not an exercise of dominion, an incorrect or illegal exercise. But that's an argument that there's no conversion. That's not an argument of others covered under the economic loss doctrine. Well, again, when you look at what is – the reason it's covered by the economic loss doctrine is because it all arises under the contract. It all arises because of the breach of the contract by Urington Ford by selling vehicles out of trust. And so when you go – again, when you're looking at what is arising out of a contract, you look at whether the parties are in a position to allocate risks. Again, GMAC – I'm sorry, Urington Ford had the ability to allocate its risk by stating – Yeah, but I think you're putting a shoe on the wrong foot when you talk about allocate risk. The entire justification for the economic loss doctrine is that the negligently performing actor, because it's negligent rather than deliberate, is not in a position fully to evaluate the risk, and therefore we will protect that party. We're not talking about the evaluation of risk of the party against whom the tort is committed. And if we're talking about an intentional tort, the person committing the intentional tort has an opportunity, because it's intentional rather than negligent, to evaluate the consequences of his or her acts. The same concept applies in terms of where – you've got to look at what's being alleged here. I mean, the fraud claims – very, very sketchy in terms of whether they even met the alleged allegations with particularity under Rule 9c. But when you pull that out and we're all the way at the summary judgment stage, and we're talking about what they're complaining about. They're complaining about GMAC saying, I need you to sign this document. I need you to do this. I need you to inject additional capital. We feel insecure. I need you to do that. That is what they're saying is fraud. And so, again, you look at the allegations and you look at what is – They're saying more than that. And it may or may not be proven. And there may be all kinds of defenses you have. But what they're saying is the representation by your client as to what was in those documents was not true. They are – And that may or may not be an accurate statement as to what actually happened, but that's what they're saying. Well, that may be what they're saying, but you've got to remember, this is – Bill Giles never read a single document that he signed. He says, I never – I never read one of these documents. So what they represent – I mean, when we develop at the summary judgment stage, we're still going back to whether it's interwoven within the contract. All the conduct complained upon arises from and is a result of the wholesale floor plan agreement, which they admit admittedly breach. So I know I'm running out of time, but I know you want to talk about the fiduciary duty aspect of it. And what I want to do there is point to the parts of the record in which they're claiming gives a fiduciary relationship and why that is just bad social policy to hold a lender or to even bring a question of fact, hold that there's a question of fact as to why a wholesale floor plan financer has to defend a breach of fiduciary claim. You look at what they allege. A person who has no relationship at the beginning of the relationship in 1992, I believe, makes some comment of this is like a marriage. Well, banking relationships, in order to get business, people look at personal relationships. That is not enough to create a fiduciary duty. It might have been a bad marriage. Then you go into the fact that this is a middle manager to begin with, and he's replaced with someone else who, according to Mr. Giles, becomes a good friend. That person's name is Doug Snyder. He's a good friend. Well, a good friendship with a middle manager of a corporation that operates nationwide I don't think is enough to make a fiduciary relationship. Then you look at what they are raising for the first time, which is this notion of control and dominion. And what I'd like to point to is a case that they cite in their brief, Blue Line Coal v. Ecobank, 683F, sub 493, where they cite a string of cases which stand for the proposition that the monitoring of operations and proffering management advice without more does not show control. Merely taking an active part in the management of the debtor corporation does not automatically constitute control. Creditor must assume absolute and total control, not just take steps to minimize risk. What is clear from the record below is that GMAC was doing, was just taking steps to minimize risk. They're taking steps to, because they feel insecure because of what has happened. And if we're talking about imposing a fiduciary duty or even creating a question and effect under those circumstances, we're talking about shifting burdens on society here. We're talking about making it more difficult at the end of the game. It'll be more difficult for floor plan financing to be obtained by dealers. It'll be encouraged lenders or floor plan financers to basically pull the financing instead of working with them to try to maintain, do what they can to try to help Earrington Ford with its business. What I'd like to point to is the Nevada Supreme Court cases, in particular McIntosh and the Perry v. Jordan case. The McIntosh case talks about two situations in which a confidential relationship might arise. And that's where one party imposes special confidence in the other. But more importantly is the second element, which is the other party knows of this confidence. No evidence in the record about GMAC supposedly knowing of this confidence imposed upon them. They weren't running the business. Holding keys is basically protecting your security. Now, your time is running on you. And before you finish, I'd like you to address the race to Zuccotti. The reason I'd like you to do that is that at the moment I'm inclined to think there was no race to Zuccotti with respect to the contracts claimed brought by Giles Chevrolet. I speak only for myself, but I want to alert you where my point is. Sure. Res judicata. Elements are same claims. The actually adjudicated on merits imprivity. Now, are we talking claim preclusion or issue? We are talking claim preclusion. Just to make sure. The only issue raised below is claim preclusion. I mean, is same claim. The other issues are not before the Court have not been raised in the brief. And my problem is that the contract claims that were dismissed in the Arrington Ford case were they were dismissed because of this were a contract between Arrington Ford and GMAC. They are all brought together. The contract in the second case is a separate contract. It's a contract between GMAC and Giles Chevrolet. Are they two separate contracts? They are, but they're all incorporated together in a cross-collateralization and cross-guarantee agreement. But the cross-collateralization is a different contractual arrangement. It is a contract that incorporates all the documents of Arrington Ford, Bill Giles Chevrolet, and a breach of any one of the other documents constitutes a breach of the others. Did Arrington Ford have a right to bring suit for breach of contract with Giles Chevrolet? I, Arrington Ford against Giles Chevrolet? Ostensibly, yes. Because of a breach by one. Yes. I want to make sure you understood my question clearly and I want to make sure I understand your answer clearly. Could Arrington Ford, suing on its own, said I bring suit for breach of contract not only with your contract with Arrington Ford, but I bring suit for breach of contract with your contract with Giles Chevrolet. With Giles Chevrolet not being a party to the lawsuit? Against GMAC. They're all brought under the cross-guarantee and cross-collateralization agreement. So you're saying that Arrington Ford has a right to sue GMAC for breach of GMAC's contract with Giles Chevrolet? I think if it falls within the cross-collateralization agreement and the cross-guarantee. Well, you just put in an if. Well, I mean, that's the document that brings it all together, Your Honor. And what I'm talking about when we talk about res judicata is all claims that were brought, not only all claims that were brought, but that could have been brought. And so at the time when they filed the lawsuit on behalf of Arrington Ford, they could have brought the issues with Bill Giles Motor Company. If the contracts say exactly the same thing, they were all incorporated into the cross-collateralization agreement. I'm out of time, Your Honors. Thank you for your indulgence. The reason stated above, I believe this case, this district court's decision should be affirmed. Thank you. Thank you, Your Honor. I'd like to begin by addressing the res judicata point. Our position is quite straightforward. The contract claims of Bill Giles Motors are based on a separate contract. To prove that GMAC breached that contract, Bill Giles Motors would have to introduce different proof than would be required in the Arrington Ford case. They would have to show different conduct. No, but the question is, you know, could that claim have been raised, not that necessarily it was raised? Because what's your response to this, you know, cross-collateralization point? Well, first of all, I don't believe that there's any basis under the cross guarantee for Bill Giles Motors to have brought a claim against Arrington Ford for Arrington Ford's misconduct against GMAC. No, not against Arrington Ford. I'm sorry. GMAC's misconduct with respect to Bill Giles Motors. Because that claim would be based not on the financing agreement, but sort of more operational questions like whether or not GMAC was imposing penalties on Bill Giles Motors as the result of an aged inventory earlier than usual, whether they were applying earlier discounts requiring Bill Giles Motors to pay off cars earlier than usual. It didn't have anything to do with a guarantee provided by the Arrington Ford. So I think that if you take a look at the agreement, it would not have provided a guarantee provided by Bill Giles Motors. And I think importantly, under Nevada law, the question of whether the two causes of action are the same involves a discussion of whether or not the facts necessary to prove the two causes of action are identical. Here, the facts needed to show the two causes of action are different. Different conduct involving different dealerships. It may be the same sort of conduct, but it requires conduct involving Bill Giles Motors rather than the Arrington Ford. And to resolve it, it requires an interpretation of a separate contract. The district court writes that the standards of – well, district court writes not specifying claim preclusion, but it's pretty clear that the district court means claim preclusion. The district court writes that the standard under Nevada law and under Federal law for claim preclusion are the same. Do you agree with that? Well, the Ninth Circuit's test, it is used typically to determine whether there's a common nucleus of operative facts, sort of the same transaction or occurrence test. The Nevada court has phrased it differently. And the court – the case the district court relies on is the Round – I'm sorry, the Round Hill general case, which is a 1980 Nevada case. And that case is quite explicit. I think I just heard you give me the answer no. No. You did, Your Honor. It is slightly different. And, of course, when a Federal district court is sitting in diversity pursuant to Erie, it follows the State court's guidance as to whether or not claims are res judicata. The second issue I'd like to address briefly, very briefly, is the issue of waiver. They made the same argument below. The district court rejected it. It proceeded to write a 30-page opinion analyzing the economic loss doctrine. That's precisely why we are here today. The claims present in this appeal have never been dismissed. No one has ever conceded that those are barred by the economic loss doctrine. And I think you've heard why no one has ever conceded that they're barred by the economic loss doctrine. The Nevada Supreme Court has answered that question of whether intentional torts can be barred. It has answered it twice. Both times it answered it in the negative. The doctrine does not apply to that type of conduct. And finally, with respect to the fiduciary duty claims, the Nevada Supreme Court has already recognized that a lender-borrower relationship can be a fiduciary relationship. That question should be resolved by the jury. In this case, there is substantial evidence that GMAC chose to take control over the affairs of the Arrington Ford. It did that for its own benefit, to make itself feel secure, but it had control over the operations, and it had substantial leverage over the Arrington Ford and Bill Giles Motors. That was enough to create a fiduciary duty. And for that reason, we think the district court should be reversed. Roberts. Thank you very much. For your useful arguments, the case of Giles et al. v. General Motors Acceptance Corporation is now submitted for decision.
judges: Goodwin, Tashima, W. Fletcher